May I reserve two minutes of my time for rebuttal, Your Honor? Yes, and please introduce yourself for the record. I'm Anne Murphy, and I'm here to represent Mr. Beebe. I have with me at council table our trial counsel, Joe Scher, and as we're going to be talking about him, I think we should also all be aware that Mr. Beebe is here in the courtroom, although he chose not to sit with us. Your Honor, this case... Give him qualified immunity. That would be lovely, Your Honor. I'll quit while I'm ahead. Your Honor, it's our position that this case is really legally indistinguishable from the first Wong case and that the rights under the Fourth Amendment were, if anything, even less well-defined and less clearly established in 1999, which is the time that we're looking at, than the Fifth Amendment rights at issue in Wong I. The magistrate judge didn't give any good reason for distinguishing Wong I and, in fact, really didn't get into the question at all of whether the constitutional status of Miss Wong was clearly established at that time. But Wong I turned on constitutional status, qualified immunity, if the person wouldn't know that the person had the constitutional right that was allegedly violated. And the other thing is, Your Honor, we think it's very telling that the district court judge in Tongwarara, I hope I'm saying that right, after looking at all the relevant authorities about constitutional status in 1999 of entry fiction aliens under the Fourth Amendment, looked at all the cases, looked at the briefs, presumably did his own research and concluded that there was no clearly established law at that time. My counsel, hasn't it been true for decades that strip searches are different? They're just different. There have been lots of cases before, at that time, regardless of Verdugo, that made it clear that they were different. Your Honor, there may have been cases, I mean, different from what is kind of coming into my head. Let me give you what I'm talking about. For example, United States v. Montoya de Hernandez, a Supreme Court case, 1985. But Your Honor, if I may, in Verdugo, the Supreme Court actually talked about that case and said, I know we held it, I know we said it, we didn't hold it, we didn't reach it, and Verdugo itself says, you know, that one's kind of up for grabs now.  Okay, well, let's go then to Barrera, Echeverria v. Rizón, United States v. Barrona, which followed Verdugo and interpreted the Supreme Court's comment about the Fourth Amendment not applying to aliens unlawfully present in the United States and said that that was a very unusual situation. You've got somebody outside the country, etc., but that in a normal situation, it does apply in limited ways and certainly with respect to strip searches. But which case was that? Because Echeverria, whatever it was, in 1995, the en banc decision from this court said, the law is very unsettled as to the rights of these entry fiction aliens. That's what they said. And I think that Mr. Beebe, who's not on the Ninth Circuit or a federal district judge or anything else, would have been entitled to look at the disarray in the law, certainly to look at Verdugo's statement about what Mendoza-López had assumed about the rights of entry fiction aliens. I mean, if the Supreme Court's saying, it's open now, we don't know, we know we had that case, but now we're backing off of it, it would be really blatantly unfair to charge a district immigration director with kind of understanding how the law would unpack. I'd like to ask you about the first saussure prong here, even though we now, in theory, have the authority to skip over it, but if you were to lose on the legal clarity question, we would have to go back to the first question to determine whether there was a constitutional right violated. And I would appreciate your talking, if you would, about the application of Bell v. Wolfish and also about whether you think it would be prudent for us to await the en banc decision in the Bull case, which is a pending argument. Your Honor, I don't want to disappoint you and not answer your question. I'm not authorized to take a position on the underlying constitutional violation. This is a direct government appeal, and the Solicitor General has not authorized me to make an argument on that question, so I won't do it. On the other hand, having suggested... Can you talk to me about the sort of, look, we need help here with our job, and if we determine that we need to reach that first saussure step, should we wait for Bull? Yes. Counsel, can I just... Why don't you let us finish our question? Jumping in before we get... I apologize, Your Honor. I'm having trouble tracking the question. Yes, I think it would be an excellent idea to wait for Bull, which may cast some substantial light on this question, on how Bell v. Wolfish should be interpreted and whether the strip search cases are going to be reexamined. That would be a very good idea. If it turns out that Your Honors wish to reach the underlying constitutional question in this case, we would respectfully ask that you order supplemental briefing on that issue from us so that I can, among other things, get authorization from the Solicitor General to argue the position of the government and also, you know, perhaps brief Bull as well. However, it's our position that this is an excellent case under Person v. Callaghan for not reaching the underlying constitutional question because it is clear that there's no... I mean, that there was no clearly established law that could have told Mr. Beebe in 1999 about the constitutional status under the Fourth Amendment of an entry fiction alien. As I said, the Tongwarara District Court didn't find anything on point. There's nothing in the brief of either Ms. Wong or her amicus that would say, here is a case that Mr. Beebe should have looked at, or even if he didn't, a case that clearly established as an objective basis what the law was in 1999 so that he would have known that she had Fourth Amendment rights. So, if you assume that a person was subjected to strip search with members of the opposite sex, you don't think the law was clearly established to constitute an intended protection for a person in the United States who could be strip searched? I don't think her status... Your Honor, this case is about... Part of the legal theory of liability for Mr. Beebe is that he is charged with imputed knowledge of the strip search policies at the county jail. So, there's nothing in this case that suggests that Mr. Beebe even remotely would have known that the strip search would have been carried out in front of members of the opposite sex. Didn't he testify in this case, in the deposition, that he didn't care? Your Honor, that... He didn't care, but he was the one who made the decision, did he not, to put her in the custody of the county jail? Probably not, Your Honor. There are disputed issues of fact on the causation issue. We didn't brief it, we didn't bring it up to this Court on an interlocutory appeal, but there are serious issues of fact. At an absolute minimum, even accepting for purposes of this appeal, since we haven't appealed it... But we have to take the facts most favorable to the plaintiff in this case, so I just want to make sure I understand your answer. Assuming if there is a disputed issue of fact on causation, are we not then to assume that he did, in fact, authorize it, and that he was, in fact, the one who caused her to be there in his supervisory role, so that he made a decision to put her there, and then the conditions under which she was strip-searched would be imputed to him? Your Honor, I think there's two problems with that. First of all, even the causation theory found by the magistrate judge was not that he decided to put her there. It's quite clear that he did not decide to put her there, and he was not responsible for making that decision. The causation theory is that he put... that by dealing with her immigration status, allegedly, which we also dispute, he put in motion a series of events that ended up with her being strip-searched. Our only point for purposes of this appeal is that if he's going to be charged with knowledge of Multnomah County's strip-search policies, that policy, and it's at the very beginning of our supplemental... of our excerpts of record, the policy is that the strip-search must be conducted in privacy by a member of the same sex. So, you know, let's assume that the allegations are true, and that Ms. Wong was strip-searched where men could see her. It's just not legally possible to impute that to Mr. Beebe. Because it was a violation of the policy that he was allegedly... Because it was a violation of the policy, and that would be an intervening or supervening cause that would cut off the chain of causation, at least for that aspect of it. And, Your Honor, there was something else that you said that I really wanted to get to. Although, I must say, the notion that Mr. Beebe's testimony means that he's callously saying, I don't care what happens to the TAs, is really misleading. If you just look at pages 128 to 130 of Volume 1 of the supplemental excerpts, that's where his testimony is. And what he says is, and he was wrong, I detain people in the county systems. They have problems running their jails. They have contraband. They have, you know, all the ball kind of factors that come in. He said, I don't feel that it's appropriate for me to tell them how to run their jails. And so, if they were having a strip-search policy, no, that wouldn't concern me. So, it certainly wasn't the notion that, you know, whatever happens to aliens, I don't care. It's very far from that. Obviously, that's our take. You'd have to look at it yourself. Right. But the testimony is there, Your Honor, in the record, 128 to 130 of Volume 1 of the supplemental excerpts. As I said, the magistrate judge in this case didn't really take the view that you took, Your Honor, that strip-searches are different. But that doesn't really go to the issue in this case, which is the question of constitutional status, which is what Mr. Beebe wasn't aware of. And to have clearly established law, there would really have to be something to have told him that an entry fiction alien like Ms. Warren would have had rights. Does it matter for purposes of our analysis whether he knew that she was or was not of that status? It doesn't, Your Honor, because it's an objective standard. It's not about, you know, what did he know, what did he intend. You know, the policies of qualified immunity are carried out through the law, which requires an objective test. So what we do is we look at the cases that were decided and the state of the law. So really it doesn't matter whether he knew or not. If the person had been lawfully here, if she had not gone out or she came back under parole, and they had her in removal, whatever, and she hanged, didn't have the entry fiction, she would have been in the status of lawfully in the custody of the then INS. Would your argument still be that it was okay for him to put her in a jail where they script-searched without individualized suspicion when I believe the INS policy at the time was he don't do that? Your Honor, I think the answer is that a view of whether she had rights under the Fourth Amendment would be that she probably did because it's the entry fiction part that makes the case difficult. So it's just that little quirk you're saying that if somehow her status shifts so that she raises some doubt as to whether someone who has lived here seven years goes out, doesn't get parole, come back in. So she's now reverted from what was described as someone with long-term ties to the community, has now had them in this legal fiction severed so that when she comes back in, that status is now okay to put her in a facility that scripts her. Your Honor, it's not our position that the ties were severed. We're not taking a position on what the underlying constitutional question was in 1999. No, you are with respect to status. With respect to status, absolutely. There's no... Saying that if she had not... I'm backing up. I want to make sure we're on the same page here. You've told me that if it wasn't but for the entry fiction that her baby would have been charged with knowing that she had Fourth Amendment rights not to be scripted and a detention facility. I suspect that that's right. I didn't brief it. I suspect that that's right. For what? I don't know how they're mooting cases in the DOJ these days, but if you're not prepared as a matter of policy to talk about the ramifications of this case, then you're not being very helpful to it. I don't know if you're under such constraints that you can't respond to questions from the bench. That's your argument. I guess we're stuck with it. Your Honor, I'm willing to suggest that if it weren't for the entry fiction, which is what makes it such a hard case under Verdugo, that if she had been continuously present here, like she'd been a normal non-admitted alien rather than an entry fiction alien, she probably would have had Fourth Amendment rights. All right. So given that situation, what your defense in this case at this point in this appeal turns on, whether that entry-level fiction created enough of an uncertainty that it wasn't clearly established that this particular person of that status was subjected to intrusive personal invasion that would clearly be unconstitutional. Had she not, because of the entry-level fiction, lost her protected status. That's exactly right, Your Honor. And immigration, as I'm sure you know, it's all about status. And Wong Run recognized that the entry fiction is a very important part of the status problem in terms of how the constitutional rights play out. Now, let me just kind of follow up just briefly. At the border, if she had come across at the border, would she have been subject to strip search? They would have had to have reasonable suspicion at the border. And that was a constitutionally established principle at the time. There are border search cases which are not entry fiction cases. The entry fiction cases say substantive rights, we're not sure. The border search cases apply the Fourth Amendment, but they apply it in a very strange way. For example, you don't need reasonable suspicion or probable cause for a search. Can I just – Oh, please. One point. To go back to what I said before, I wanted to find out whether you agree that it made no difference for purposes of the second prong of sacier whether this woman had the entry-level fiction or not, if Mr. Beebe didn't know and didn't care whether she had that. It makes every difference in the world, Your Honor, because it's an objective standard. The question is what – It used to be years ago that there was a subjective test, and the Supreme Court said, no, we can't go looking in everybody's heads. We're going to look at the cases, we're going to look at the clearly established law, and basically impute that to the public officials. Can you go back to what you said then to Judge Fischer, right? I'm sorry? Go back to what you said to Judge Fischer in terms of the whole issue comes down to that entry fiction. Yes, it is a question of the entry fiction and status, yes. Thank you, counsel. Mr. Steenson? Thank you. Tom Steenson on behalf of Kwai Fun Wong, the plaintiff and appellee on the appeal. The evidence in the record is that David Beebe, the director at the time, simply didn't care about what Multnomah County's published policy was as to a blanket strip search of all individuals. And I think a very important fact in this particular case in that regard is the fact that there is no evidence, it's undisputed, that Ms. Wong was not charged with a crime, was not suspected of any unlawful activity except for the immigration issue. And nonetheless, he chose the facility. He put her in that facility by virtue of the choice he made, despite the options he had to use hotels and other facilities. Can I interrupt you for a second? Yes. I want to get back to what the government's counsel said to see your position. He takes the position that the only thing that we're looking at for purposes of the second prong of Saussure is whether cases dealing with strip searches and Fourth Amendment rights at the border, we're limited to looking only at those that involve the entry fiction. Do you agree with that or not? I do not. Okay. And why do you disagree with that? I think the job of every defense lawyer I've ever run up against on the qualified amenity issue is try to narrow the contours of the clearly established right so far and make it so fact-specific. Tell us why this right for your client was clearly established at that point. What cases can you cite? Can you cite any cases that involve someone where the entry-level fiction existed? I don't know of any cases where the entry-level fiction was at issue with respect to a strip search. Okay. So the two of you are on different – if she's right, she wins on the qualified amenity. If you're right, you win on it, presumably. What's the closest case that you can find in the relevant time framework that you think shows that Mr. Beebe should have known that this constitutional right was established and applied to your client? I disagree if she's right that the government is. Okay. Well, hypothetically. Every strip search case involving specifically the immigration people decided prior to 1999 had gone in favor of the plaintiff if there was not reasonable suspicion of particular conduct or activity. Every case. And it is incongruous to suggest that for some reason somebody with or without lawfulness who was entering at a border, a lot of the cases involved the Mexican border, somehow is entitled to the protection of the Fourth Amendment and the reasonable suspicion standard, and Ms. Wong, with significant ties to the community for about seven years, a practicing ordained minister, in and out of the country twice, multiple adjustment of status applications represented by a corporation, at least one or two of those applications, represented by an attorney who was in contact, I think at least three contacts upon her last return with Mr. Beebe's office, that under Verdugo it specifically suggested that even someone whose property might be searched outside of the country who had significant ties might be protected even in that context. You know, I'm still wrestling with the first half of Saussure here, because we're about to hear as an en banc court the case, the Bull case, which I'm sure you're familiar with, and in that case what's at issue is a policy, I believe it's the city of San Francisco, that any person who enters the general population of the jail is to be strip searched because of a variety of dangers that can ensue and for the protection of all, and we have yet to decide whether that's okay or not, but it seems to be a relatively similar policy to the Multnomah County policy here, which is that anyone who comes into the facility is to be subjected to that kind of a search. Even if you're absolutely right about the second piece about whether the entry fiction plays, why shouldn't we wait and find out what our rule is going to be about the extent of permissible searches upon entry into a jail facility? I'm assuming that the Ninth Circuit en banc will follow the past decision. Well, we can't assume anything. I understand. The whole point of taking a case is to take a look at that area of the law and decide what is the right answer, but we don't know what it is right now. There are at least two factual distinctions with this case and the Bull case. In this case, there was nothing in the record and no attempt was made by David Beebe to suggest there were any factual underpinnings such as security concerns that would require a blanket strip search policy. It wouldn't be his. It would be the question of whether the county's policy because of the county's concerns. And there's nothing in the record to suggest that the county had the kind of concern that apparently the Bull defendants posited as a defense for their blanket strip search policy. The second issue, though, is the way I read Bull, every single person that was going into that facility was either charged with a crime of some sort or another. I don't see anything in Bull to suggest that civilly detained individuals such as Miss Wong, with absolutely no criminal cloud over her in terms of the kind of activity that historically has allowed for strip searches, should somehow by default fall into the class of suspected criminals or people serving sentences or on probation violations who may or may not be subjected to a blanket strip search policy. I think it's factually much different than in this case where we have this civilly detained person with absolutely no record whatsoever to suggest any involvement with contraband or violence or criminal activity. She couldn't have been more pure or more innocent. You feel that there should be a distinction made based upon whether the person is detained civilly or criminally because of our constitutional. It certainly is important in this case when you're talking about the possible application of a blanket strip search policy simply because they're going to house her with people that are charged with crimes. As you know, anything that we write in one case, people are going to extrapolate it to something else. Take a psychiatric hospital where someone has been committed and they are a sociopath and they like to kill people, but they're civilly committed, not criminal. Is there anything that would bar the psychiatric officials from doing a strip search of someone who's not criminally charged, but they have those tendencies and they're locked up civilly? Could they search them? The pure civil distinction may not be accurate when you factor in someone who has a history and a propensity to kill people. That's clearly distinguishable, and that person probably under a blanket strip search policy would be searching. They've never done it before. They're in a psychiatric hospital, but they're considered to be deeply troubled, let's say. They've never killed anybody, but they're worried about them. And simply coming in from the street and being housed with other people in that facility. I'm not sure, Your Honor. Without a factual basis to suggest there's really a security concern, which I understand in Bull, again, the jail people posited evidence to support that. The issue with the blanket strip search policies and the reason why I think that we may have to come to grips with that in this case is that part of the justification for them isn't the individual dangerousness of each person, but the dangerousness of the other people with whom you will be housed. If you or I had a pocket knife, we wouldn't use it for anything except, you know, maybe clipping our nails or whatever. We're not going to misuse it, but our cellmate might. And so the rationale for the blanket strip search policy doesn't rely only on the individual being searched, but also on the need for collective safety. I don't know what that case is going to hold. I guess my concern is why shouldn't we wait for it and figure out what the parameters are, because if a policy like this one is permissible, we would never get to all this stuff about the entry fiction. I believe on the record before, Your Honors, that because she was civilly detained with absolutely no suggestion of any criminal activity, propensity for violence, possession of drugs, and the significant ties she had to this community, that there absolutely under any situation should not be a justification for strip searching. Well, that might be – that's sort of – I understand the argument, but I don't understand the logic of it, given what the paper said. There's an institutional concern. So if the Enbank court decision come down and say, say one of two things, posit one of two things. One, it could say that prisons or jails are different. They have institutional concerns with safety. And anybody who is put inside with other inmates, civil or criminal, are subject to strip search, because they are a potential conduit for contraband or dangerous drugs or dangerous weapons. So the civil criminal hook doesn't do anything. Or it may say that there has to be some evidence why you have to strip search everybody. And I understand you to be saying that in this case, there is no evidence. Noma County Jail blanket policy is predicated on any of the hypotheses. I'm hypothesizing here. Yeah. And therefore, that would be an issue that has yet to be resolved. Now, how is Mr. Beebe supposed to establish the Noma County rationale? He's not the jailer. He simply doesn't have to use the facility. Let's say they had a policy to beat every third inmate to make sure that they all understand that they better follow the rules. Just because that's what the facility does doesn't mean he can put someone in this wrong situation. But he has to understand that it's unconstitutional. He has to understand that what's going on is unconstitutional. We're positive. In fact, the law is it is constitutional to do so. It's not a Fourth Amendment violation to blanket strip search as long as the jailer puts forth information sufficient to make it reasonable. So, therefore, if Noma County puts forward it's sued because it's got a bull type situation. Criminal inmates, they put forward evidence and say this is why we have the same policies. And it's accepted as a Fourth Amendment violation. So what is Beebe's? Why is he subject to a higher standard than the jailer would be? Well, for the simple reason that he had options and he had a choice. And he could have and should have made the decision that he wasn't going to put a civilly detained, non-violent, non-criminal person who he was simply detaining. So that's clearly established law that he would know that it's a Fourth Amendment violation for him to exercise his discretion, put her into the Noma County Jail, but not to do so if there's a blanket strip search policy. Even if it's constitutional to everybody else who's in it. How he could believe that she could be subjected to a strip search on some blanket strip search policy basis, and those at our borders cannot be subjected to strip searches except for reasonable suspicion, combined with the decision in Verdugo, which talks about significant ties to the community and what that means in terms of Fourth Amendment protections. What does the record show or what does the law say about what other options he had that were available besides housing in a jail facility? I hope I'm not misstating the record. There was evidence about hotels and motels and other facilities. I think Clark County and the Dalles are two examples. I believe those were options available as of the time that she was placed in the Montgomery County Jail in 1999. If I've misstated the record because it was developed after that time further, I apologize. What's your position about Ms. Murphy's point that there is a break in the causal link here? Does that mean she's right about that? No. Why is that? He signs the contract for the use of the Montgomery County Jail facilities. There are statutory obligations as the supervisor of the district for him to conduct oversight, in fact inspect, they're supposed to evaluate the quality of care, et cetera. There is no reason why in his capacity as that supervisor he didn't know. Of course, the truth of the matter is he didn't care. Are there regulations dealing with such a contract that would require Mr. Peavy to conduct certain investigations or do certain analyses with respect to the Multnomah facilities before he signed the contract? Yes. What are those? I don't have the particular sites. They're in the record. They are in the record. Yes. Maybe he sent us a 28-J letter that tells us what the criteria are that he was supposed to do. I mean, if that contract says, you know, you've got to be absolutely certain that nobody that goes in here is going to be script searched, then we've got a different matter. It's not that specific. I don't think you're going to find that, are you? No. But this wasn't a de facto policy or a practice that simply you had to search out for. It was a written, published policy of FTSO, the Multnomah County Jail Facilities. Thank you. Ms. Murphy, you used your time, but we'll give you two minutes for that all. Thank you so much, Your Honor. Your Honor, part of what was discussed seems to come more to questions of negligence. There is a parallel FTCA claim against the United States for negligence for the conditions in the Multnomah County Jail. Here we're talking about a personal damages action against a public official who's entitled to assert qualified immunity and on an objective standard. It's not about what he knew, what he did. It's about what the state of the law was. And it seems to me that with the Dugo-Oqueda court specifically backing off that border search decision, really nothing filling in the gap, and Wong Won explaining that not knowing what somebody's status is under the entry fiction, to what extent that gives substantive constitutional rights, that Mr. Beebe is entitled to qualified immunity here, and Ms. Wong should pursue her remedies in negligence against the United States. Thank you, Your Honor. Thank you, counsel. We appreciate very much the arguments of both counsel. They've been quite helpful. And the case just argued is submitted. Our final case on this morning's calendar is Browning v. United States.
judges: Graber, Fisher, Smith